513 A.2d 373

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Otis PETERKIN, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 1985.

Decided July 25, 1986.

300

302

304

Harold Diamond, Philadelphia, for appellant.

Robert B. Lawler, Chief/Appeals Div., Elizabeth J. Chambers, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

The appellant, Otis Peterkin, was convicted by a jury of robbery,[1] possession of an instrument of crime-generally,[2] and two counts of murder in the first degree[3] for the

1. 18 Pa.C.S. § 3701.
2. 18 Pa.C.S. § 907(a).
3. 18 Pa.C.S. § 2502(a).

shooting deaths of two persons. These crimes were committed in the course of a robbery of a service station in Philadelphia. Following the jury's rendition of the verdicts of guilt, a sentencing hearing was conducted in accordance with Section 9711 of the Sentencing Code,[4] 42 Pa.C.S. § 9711, resulting in a determination by the jury that the appellant should be sentenced to death. Post-verdict motions were denied and the appellant was formally sentenced to death in accordance with the jury's findings.[5] Direct appeal from the judgment of sentence was taken to this Court. *See* 42 Pa.C.S. § 9711(h)(1) and § 722(4). In this appeal appellant raises a myriad of issues which we shall address below.

## I. SUFFICIENCY OF THE EVIDENCE

■ It is the practice of this Court in death penalty cases to review the sufficiency of the evidence to sustain the conviction of murder in the first degree whether or not the appellant contests the issue. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27, n. 3, 454 A.2d 937, 942, n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh. denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

Appellant contends that in undertaking such review, we should not consider the testimony of various witnesses which, allegedly, was improperly admitted into evidence. This contention, however, lacks merit. In determining the sufficiency of the evidence we look to the entire record and do not exclude for that purpose alleged errors in the admission of that evidence.[6] This is true even as to matters of

---

**4.** Act of March 26, 1974, P.L. 213, No. 46, § 3, *as amended.*

**5.** Appellant received consecutive death sentences on separate counts relating to each murder. In addition, he was sentenced to ten to twenty years imprisonment for the robbery conviction and two and one-half to five years imprisonment for the possession of an instrument of crime conviction, to run consecutively to the robbery sentence.

**6.** Errors of admission raise independent issues and may for constitutional or other reasons require a new trial without reference to sufficiency. An error of admission may diminish sufficiency to a

constitutional dimension. *Commonwealth v. Wallace*, 500 Pa. 270, 275, n. 2, 455 A.2d 1187, 1190, n. 2 (1983). This, for the reason that if sufficiency fails upon the whole record the matter is at an end and cannot be retried.

The test to be applied in reviewing the sufficiency of the evidence is whether, viewing all of the evidence admitted at trial in the light most favorable to the verdict winner (here the Commonwealth), there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976).

This tragedy began in November, 1981, when two bullet-riddled bodies were found dead at a Sunoco service station in Philadelphia. The Commonwealth offered the following evidence inculpating the appellant. Appellant was a former employee of the gas station and last worked there in October of 1981. Known for that reason to all the employees, he appeared at the station on November 29, 1981. While appellant was there, an employee, Ronald Presbery, made a phone call to an off-duty employee, Maurice Rogers. During the course of the conversation Presbery told Rogers that the station manager, John Smith, and the appellant, with whom Rogers was familiar, were in the back office testing a gun. Presbery said he had heard a shot. He told Rogers that appellant was locking the door to the station, and asked Rogers whether appellant was supposed to have a key to the station.

About noon, two men, Stanley Trader, a former employee at the station, and his brother, Clarence Sears, arrived at the station. Presbery came to their car and told them that appellant, who was in the cashier's booth, had a gun and the combination to the safe. They directed their attention to the cashier's booth and saw appellant who they knew from before as an employee. Trader and Sears left the station,

point where a new trial may fail for that reason. That is, however, a question that can only be resolved at the new trial, because different proofs may be available to prove the necessary elements, without the improper evidence.

and went to a movie. However, sometime past 4:15 p.m., they returned to the station, and found appellant in the cashier's booth. Appellant told them that Presbery had left with some people in a car and that if they were to see him tell him "Greg" said hurry back. Mr. Trader was not to see Presbery until later that day when the police found his dead body in the cashier's booth, riddled with fifteen bullet wounds. It was determined that Presbery died a few hours before his body was found.

The next morning, police found the bullet-riddled body of John Smith, on the ground next to the open and empty safe. Smith had been dead for less than a day.

Four days before the murders appellant had spent time with an acquaintance, Sherry Diggins. Appellant told Ms. Diggins that he was going to run into some money on Sunday, the day of the murders. Sunday evening appellant came to Ms. Diggins' house and asked if they could go somewhere private. She and appellant went to her bedroom where appellant asked her to open envelopes containing money. The envelopes were those used to hold money in the safe at the station. She gave him a black velvet bag in which he placed a large sum of cash he had with him and the money from the envelopes Ms. Diggins had opened. The bag was later recovered from appellant's apartment with $500 cash inside. At the time Ms. Diggins saw him appellant had two guns; he took one with him and left the other, a .32 caliber Smith and Wesson revolver, with Ms. Diggins. This latter gun was later determined by a ballistics expert to be the weapon used to murder both Smith and Presbery. Appellant had also given Ms. Diggins bullet shells to throw away. When she inquired about the shells, he replied, "it took that many to do the job." Some of the shells were recovered by police and determined to be of the same manufacture as the bullets found in the victims' bodies.

We are satisfied that the evidence is sufficient to support the jury's verdicts of guilt.

## II. PRE–TRIAL MATTERS

■ Appellant contends that the trial court erred in denying him standing to challenge the search of Ms. Diggins' residence and the seizure of physical evidence therefrom. The search was conducted pursuant to a warrant. Seized in the search were the murder weapon, bullet shells, and money taken from the service station. The court denied appellant standing to challenge the search and seizure on the basis that he had no expectation of privacy in Ms. Diggins' residence. *See Commonwealth v. Tann,* 500 Pa. 593, 459 A.2d 322 (1983). Appellant, however, asserts that he was entitled to "automatic" standing.

In asserting this claim, appellant relies on *Commonwealth v. Sell,* 504 Pa. 46, 470 A.2d 457 (1983), wherein a majority of this Court held that automatic standing was a viable doctrine in this Commonwealth. *Cf. United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) (United States Supreme Court abolished automatic standing under the Fourth Amendment to the Federal Constitution). The doctrine recognizes standing to challenge a search and seizure in a defendant accused of an offense of which an essential element of the prosecution's case is possession of the seized evidence at the time of the contested search and seizure. *See: Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Commonwealth v. Treftz,* 465 Pa. 614, 351 A.2d 265 (1976), *cert. denied,* 426 U.S. 940, 96 S.Ct. 2658, 49 L.Ed.2d 392 (1976).

In *Treftz, supra,* we adopted the standards for standing set forth by the United States Supreme Court in *Brown, supra.* Under those standards a defendant must allege one of the following "personal" interests in order to establish standing: (1) his presence on the premises at the time of the search and seizure; (2) a possessory interest in the evidence improperly seized; (3) that the offense charged include as an essential element of the prosecution's case, the element of possession at the time of the contested search and seizure; or (4) a proprietary or possessory interest in the

searched premises. *Treftz*, 465 Pa. at 621–22, 351 A.2d at 268.

Appellant did not allege any of these personal interests. He was not present at Ms. Diggins' home at the time of the search and seizure; nor did he have any proprietary or possessory interest in those premises. The only possessory offense of which appellant was accused was possession of an instrument of crime. The prosecution's case against him on that charge was not dependent upon his possession of the instrument of crime at the time of the contested search and seizure. Rather, that charge emanated from appellant's criminal employment of the Smith and Wesson revolver in the commission of the murders and robbery. Finally, appellant did not assert a possessory interest in the evidence seized. *See Brown, supra* 411 U.S. at 228, 93 S.Ct. at 1568. Thus, appellant did not establish the prerequisites necessary to invoke automatic standing to contest the search and seizure of evidence from the residence of Ms. Diggins.

Appellant next contends that the exclusion for cause of two prospective jurors from the panel, based upon their expressed views on capital punishment, violated the mandate of the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *reh. denied*, 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968). In that case the Court held that a death sentence will be vacated where prospective jurors have been excluded from the panel simply for voicing general opposition to the death penalty or for expressing conscientious or religious scruples against its infliction.[7]

This contention lacks merit. First of all, defense counsel affirmatively indicated that he had no objection to the challenges for cause of the two venireman, Scafonas and

7. The practice in capital trials of removing for cause prospective jurors whose opposition to the death penalty is so strong as to prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial has recently been re-approved by the United States Supreme Court. *Lockhart v. McCree,* —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

Read. Obviously, he was satisfied that these two venireman were properly excluded under the standards of *Witherspoon* and its progeny. Under these circumstances, the issue of whether the exclusion was proper, even though of constitutional dimension, has been waived. *Commonwealth v. Szuchon*, 506 Pa. 228, 484 A.2d 1365 (1984).

Moreover, the record reveals that these veniremen were properly excused. In its recent examination of the *Witherspoon* standard, the United States Supreme Court chose the test set forth in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), as preferable to the original standards of *Witherspoon*. *See Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The *Adams* test is whether the juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Adams, supra* 448 U.S. at 45, 100 S.Ct. at 2526.[8]

Upon examination, venireman Scafonas expressed his view that the death penalty is an academic question since it is not carried out; "it's a term used to give life imprisonment, in that sense, I am for it." However, he stated that if death penalties were carried out in Pennsylvania he would not be in favor of the penalty and if he knew the penalty would be carried out in this case, he might find some reservation with returning a sentence of death. These views, which focused on whether the death penalty would actually be carried out, would have permitted his decision to be influenced by extraneous considerations. His response that he was in favor of the death penalty as a term used to give life imprisonment evinced a misunderstanding of the law which could have led him to misapply the court's instructions, possibly to the defendant's prejudice.

---

**8.** The *Adams* test dispensed with *Witherspoon's* requirements for exclusion that it be "unmistakeably clear" that the juror would either "automatically" vote against the imposition of the death penalty without regard to the evidence, or had an attitude toward the death penalty that would prevent him from making an impartial decision as to the defendant's guilt.

The other venireman, Mr. Read, expressed his view that as regards the judge's instructions on reasonable doubt and the death penalty, he "could not put the two together." This view clearly expressed his inability to follow the instructions of the court. Accordingly, both veniremen were properly excused.

## III. ALLEGED TRIAL ERRORS

■ Appellant contends that the trial court erred in permitting into evidence two separate instances of hearsay testimony. Initially, appellant's first complaint involves the testimony of Maurice Rogers regarding statements Ronald Presbery made to him over the phone on the morning of the murders. Rogers had testified that Presbery stated that John Smith and appellant were testing a gun in the back of the station, and that appellant was at that time locking the door to the station and getting into Smith's car. The trial court admitted this testimony under the state of mind exception to the hearsay rule. *Commonwealth v. Riggins,* 478 Pa. 222, 386 A.2d 520 (1978).

Presbery's statement that Smith and appellant were testing a gun was not offered to prove the truth of the matter asserted. Rather, the statement was relevant to show that Presbery did not suspect that appellant had criminal intentions, thereby explaining why he did not investigate Smith's absence, but continued working and allowed appellant into the cashier's booth despite believing that he was carrying a gun and had the combination to the safe. As such, the statement is not hearsay. McCormick on Evidence, § 289, 3rd Ed. (1984). Presbery's statements that appellant was locking the door and getting into Smith's car were admissible under the present sense impression exception to the hearsay rule, as they were contemporaneous verbalizations of Presbery's present observations of the events occurring before him.[9] *Commonwealth v. Coleman,* 458 Pa. 112, 326

9. Though the trial court admitted these latter statements on the basis of the state of mind exception, we may affirm the decision of the trial court, if the result is correct, on the basis of another exception to the

A.2d 387 (1974); McCormick on Evidence, § 298, 3rd Ed. (1984).

■ The second alleged trial error involving the admission of hearsay testimony concerns Presbery's statement to Stanley Trader and Clarence Sears that the man in the cashier's booth, appellant, had a gun and the combination to the safe. The trial court justified admission of this statement as a present sense impression. There is, however, nothing to indicate that Presbery was presently perceiving, or had immediately beforehand perceived that appellant had a gun and the combination to the safe. Without evidence indicating the amount of time lapsed between Presbery's observation of a gun and combination in appellant's possession, and his statement to Trader and Sears, we cannot say that the statement was sufficiently contemporaneous with the perception to preclude reflection or calculated misstatement. Thus, the indicia of reliability supporting the present sense impression exception to the hearsay rule is absent and the exception is not applicable.[10] *Coleman, supra.*

Having concluded that the trial court erred in admitting this statement, we must determine whether the error was "harmless beyond a reasonable doubt." *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1981). In *Story,* this Court set forth the standards for determining whether a trial error is harmless beyond a reasonable doubt.

This Court has stated that an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so

hearsay rule. *Commonwealth v. Shaw,* 494 Pa. 364, 431 A.2d 897 (1981).

10. Had the statement been offered to explain why Trader and Sears directed their attention to the cashier's booth wherein they saw appellant, our inclination would be to hold that the statement was not hearsay since offered to explain a course of conduct and not to prove the truth of the matter asserted. *See Commonwealth v. Cruz,* 489 Pa. 559, 414 A.2d 1032 (1980). However, since the statement was offered as substantive evidence to prove the truth of the matter asserted, we will not affirm the trial court's admission of the statements on grounds, admission through which precludes the use of the statement as substantive evidence.

insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. *Commonwealth v. Davis,* 452 Pa. 171, 178–79, 305 A.2d 715, 719 (1973); accord, *Schneble v. Florida,* 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972). Under this approach, a reviewing court first determines whether the untainted evidence, considered independently of the tainted evidence, overwhelmingly establishes the defendant's guilt. If " 'honest, fair minded jurors might very well have brought in not guilty verdicts,' " an error cannot be harmless on the basis of overwhelming evidence. *Commonwealth v. Davis,* 452 Pa. at 181, 305 A.2d at 721 quoting *Chapman v. California,* 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705 (1967). Once the court determines that the evidence of guilt is overwhelming, it then decides if the error was so insignificant by comparison that it could not have contributed to the verdict.

. . . . .

Our cases support the proposition that in deciding whether an error is harmless because there is properly admitted overwhelming evidence of guilt the untainted evidence relied upon must be uncontradicted.

*Id.* 476 Pa. at 412–13, 383 A.2d at 166 (footnotes omitted).

We are convinced that all of the remaining properly admitted evidence overwhelmingly established appellant's guilt. That evidence places him at the scene of the crime at eleven a.m. when a shot was heard from the back office then occupied by appellant and Smith. Smith was not seen again until his body was found in the back office the next day. Appellant was seen by Trader and Sears at noon and again after four p.m. at which time appellant, though no longer an employee, was in control of the station. It was determined that Presbery died a few hours before he was pronounced dead at 7:20 p.m. Appellant misrepresented his name and got rid of Trader and Sears by telling them Presbery left work. Moreover, appellant arrived at Sherry Diggins' home shortly after the incident with the murder

weapon and proceeds of the robbery. He responded to her inquiry regarding the empty bullet shells, "it took that many to do the job." All of this untainted evidence was uncontradicted.

We are also convinced that the trial error was so insignificant compared to the overwhelming, uncontradicted, evidence of guilt that it could not have contributed to the verdict. Presbery's assertion that appellant possessed a gun and had the combination to the safe was not the only evidence of these facts, nor was the statement important to support the verdict. Accordingly, we find the trial error to be harmless beyond a reasonable doubt. *Story, supra; Commonwealth v. Beasley*, 504 Pa. 485, 475 A.2d 730 (1984); *Commonwealth v. Mehmeti*, 501 Pa. 589, 462 A.2d 657 (1983).

Appellant also contests the admissibility of the testimony of Diana Dunning that she saw him in possession of a gun two days before the incident. Her testimony was that the gun she saw in appellant's possession was different than the .32 caliber revolver determined to be the murder weapon. Appellant contends that this testimony was irrelevant and that it suggested unrelated criminal activity in violation of this Court's dictates against such evidence. *Commonwealth v. Stanley*, 484 Pa. 2, 398 A.2d 631 (1979).

In *Stanley*, we held that evidence of defendant's possession of a .38 caliber automatic pistol prior to a murder was relevant and admissible where the murder weapon was known to be a .38 caliber gun. However, evidence going beyond possession, suggesting criminal activity unrelated to the crimes at issue, was not admissible, since it was irrelevant and prejudicial.

This case is distinguishable from *Stanley* for the following reasons. As to its relevancy, the evidence was offered to prove that two days prior to the murders appellant was in possession of one of the two guns which he brought with him to Ms. Diggins' home on the evening of the incident. Since it was not the murder weapon which the Common-

wealth sought to prove was in appellant's possession, the relevancy of the evidence might have been tenuous. However, we can detect no real prejudice to the appellant. The evidence was merely duplicative of other evidence; and we find its admission to be harmless beyond a reasonable doubt. *Story, supra.*

### III. ALLEGATIONS REGARDING INEFFECTIVENESS OF TRIAL COUNSEL.

■ Appellant makes numerous allegations regarding trial counsel's effectiveness. However, before addressing these specific allegations we will address appellant's contention that in the context of a capital penalty case, due process requires that counsel's performance be judged by a more rigorous standard than that applied in non-capital cases.

The threshold inquiry in ineffectiveness claims is whether the issue/argment/tactic which counsel has foregone and which forms the basis for the assertion of ineffectiveness, is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim. *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985); *Commonwealth v. Stoyko,* 504 Pa. 455, 475 A.2d 714 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984). If this threshold is met we then determine whether the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967).

The test is *not* whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decisions had any reasonable basis.

*Id.,* 427 Pa. at 604–5, 235 A.2d at 352–53. (Emphasis in original; footnote omitted).

Appellant offers no convincing argument as to why the foregoing standards are inappropriate in the context of a capital case. Nor does he offer alternatives.

We cannot accept appellant's somewhat superficial argument that the *Maroney* standard is inadequate merely because it does not evaluate the overall representation by trial counsel. Where counsel's representation lacks any specific instances of ineffectiveness, we are at a loss to identify a foundation for finding that his overall representation has been ineffective.

Turning to his individual complaints, appellant has grouped his allegations of trial counsel's ineffectiveness into four categories: (1) failure to investigate the facts; (2) failure to interview witnesses; (3) failure to research and know the applicable law; and (4) failure to present mitigating evidence. We will address these issues seriatim.

■ Soon after the appointment of Vincent Lorusso, Esquire, as appellant's attorney, Mr. Lorusso retained an investigator, Kenneth J. Powell. Powell interviewed appellant and prepared a report to trial counsel based on the interview. The report included, *inter alia,* a list of persons whose statements were needed. Trial counsel sent a letter to Powell stating that they should obtain those statements. When questioned whether he followed up this report by interviewing any of these persons, trial counsel did not recall interviewing any of them. He stated that other than the alibi witness mentioned by appellant, none of the other witnesses would have had any cogent information for appellant's defense. Appellant claims that counsel's failure to interview these persons constituted ineffectiveness with respect to both the trial and the sentencing hearing.

Failure of trial counsel to conduct a more intensive investigation or to interview potential witnesses does not constitute ineffective assistance of counsel, unless there is some showing that such investigation or interview would have been helpful in establishing the asserted defense, or would have developed more than was already known by trial

counsel. *Commonwealth v. Wade,* 501 Pa. 331, 461 A.2d 613 (1983); *Commonwealth v. Wallace,* 495 Pa. 295, 433 A.2d 856 (1981). Other than the alibi witness, all of the other potential witnesses had nothing to offer to appellant's defense but character testimony. Counsel never presented any character evidence on behalf of appellant during trial or the sentencing hearing. Thus, the issue of whether counsel was ineffective in failing to investigate and interview these witnesses revolves on whether character testimony ought to have been presented in appellant's defense at trial or as evidence of a mitigating circumstance at the sentencing hearing.[11]

▪ At the post-trial evidentiary hearing, trial counsel explained that he did not delve into character testimony during trial or at the sentencing hearing because the prosecution had damaging evidence of appellant's bad character which he did not want revealed to the jury.[12] Although evidence of good character may not be rebutted by evidence of specific acts of misconduct, a character witness may be cross-examined regarding his knowledge of particular acts of misconduct by the defendant to test the accuracy of his testimony and the standard by which he measures reputation. *Commonwealth v. Jones,* 341 Pa. 541, 19 A.2d 389 (1941); *Commonwealth v. Becker,* 326 Pa. 105, 191 A. 351

11. The United States Supreme Court has recently stated,
 [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
 *Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984), *reh. denied,* 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984).

12. This evidence included facts gathered during an investigation of appellant for welfare fraud, evidence that he was discharged from the armed services for desertion and later reenlisted under a false name, and evidence of simultaneous amorous relationships with various women, some of whom were proposed character witnesses.

(1937); McCormick on Evidence, § 191, 3rd Ed. (1984).[13] We find counsel's concern, that the potential harm from cross-examination of character witnesses outweighed the doubtful value of their testimony, was a reasonable basis for not pursuing potential character witnesses or presenting character evidence.

■ In addition, we do not find that trial counsel's failure to search for a supposed alibi witness was unreasonable. The reasonableness of counsel's investigative decisions depends critically on the information supplied by the defendant. *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984), *reh. denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). Appellant told counsel no more than that he had an alibi witness named "Cynthia," whose last name he could not remember; he did not remember her address in Philadelphia, but knew she had moved to somewhere in Texas. This information was clearly insufficient to conduct a meaningful search. At the evidentiary hearing, appellant had Cynthia's former landlady testify that if contacted she could have supplied information about her whereabouts. However, there was no indication that appellant told trial counsel about the landlady; and, contrary to his assertion, the investigator's report does not contain her phone number. Therefore, trial counsel was not ineffective with regards to investigating this possible alibi witness.

■ Appellant also claims that trial counsel breached his duty to research and know the law by (1) his failure to raise constitutional challenges to the Pennsylvania death penalty statute, 42 Pa.C.S. § 9711; (2) his failure to vigorously attempt to rehabilitate veniremen expressing their inability

13. We note that in *Commonwealth v. Scott*, 496 Pa. 188, 436 A.2d 607 (1981), we abrogated the rule which permitted the cross-examiner to ask a character witness whether he has heard of other particular crimes or arrests of the accused related to the character trait vouched for on direct. The *Scott* decision was founded upon the "undue prejudice" inherent in the knowledge of prior arrests. The instant case is distinguishable from *Scott* in that none of the conduct of appellant which defense counsel feared might be raised in cross-examination of defense character witnesses involved arrests.

to apply the death penalty statute and to object to challenges for cause under *Witherspoon;* and (3) his failure to raise a constitutional challenge to the jury selection process in capital cases developed in *Witherspoon* and its progeny. All three of these ineffectiveness claims fail to overcome the initial threshold inquiry, since the underlying claims lack merit. *Pursell, supra.*

Appellant's constitutional challenges to the Pennsylvania death penalty statute, 42 Pa.C.S. § 9711, will be discussed subsequently as Part IV of this opinion. Suffice it to say that we do not find any of these challenges to be meritorious; nor has any other meritorious challenge to the statute been raised to this Court. *See Commonwealth v. Zettlemoyer, supra; Commonwealth v. Beasley, supra; Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Accordingly, trial counsel was not ineffective in failing to challenge the statute.

Regarding appellant's *voir dire* complaint, as previously discussed, we find no merit to the underlying issue. We cannot consider counsel ineffective for declining to attempt to rehabilitate veniremen who have emphatically expressed their inability to impose the death sentence or follow the court's instructions with regard thereto; nor is counsel ineffective for failing to object to challenges for cause to such veniremen.

Appellant further questions trial counsel's failure to challenge the constitutionality of the death-qualification process in capital cases as developed in *Witherspoon* and its progeny. Appellant claims that his right to be judged by a representative cross-section of the community has been denied, since excluded from the jury was a distinct group of citizens with a set of attitudes toward the criminal justice system which were not represented on the jury in any way.

The United States Supreme Court has recently addressed and rejected this argument as a matter of federal constitutional law. *Lockhart v. McCree,* ── U.S. ──, 106 S.Ct.

1758, 90 L.Ed.2d 137 (1986). Nor are we, as a matter of state constitutional law, inclined to extend greater protection to an accused in this context than is required by the federal Constitution. The "group" of citizens which appellant claims were improperly excluded were not excluded on the basis of some immutable characteristic such as race, gender, or ethnic background, but on their expressed inability to carry out their sworn duty to apply the law to the facts. The Commonwealth has a legitimate interest in obtaining a jury that will abide by the jurors' oath and apply the law to the facts. The death qualification process which appellant claims his counsel should have challenged excluded jurors who candidly expressed their inability to abide by their oath should they, as they might, be put to the task of applying the Commonwealth's constitutionally valid death penalty statute. That process serves a legitimate purpose and hence, trial counsel was not ineffective in failing to challenge it. *Pursell, supra.*

■ Next, appellant contends that trial counsel breached his duty to present mitigating evidence at the sentencing hearing, thereby preventing appellant from appearing human to the jury, and from the jury hearing a true appeal for appellant's life. Appellant suggests that evidence regarding his military background, his ability as a mechanic and his friendships could have been presented. We have previously discussed counsel's reasons for not presenting such character evidence—his concern that he would be opening the door for damaging cross-examination relating to appellant's character. Since none of this proposed evidence in any way mitigated the heinous nature of the crime, it would have been of dubious value, and when that value is weighed against the potential for damaging cross-examination, counsel cannot be deemed ineffective for failing to present such.

Finally, appellant raises three miscellaneous claims of ineffectiveness.

■ First, he claims that trial counsel separated and distanced himself from the appellant by telling each panel

of potential jurors that he was court-appointed counsel for appellant. Appellant claims that this signalled to the potential jurors that he was not a willing participant in the case. In support of this contention, appellant relies on *King v. Strickland,* 714 F.2d 1481 (11th Cir.1983),[14] in which counsel was deemed ineffective for stressing in his closing argument at the penalty stage of a first degree murder trial that he was appointed and had reluctantly represented a defendant who had committed a reprehensible crime. The instant case is clearly distinguishable from *King.* Trial counsel simply noted that he was court-appointed counsel while introducing himself to the jury panels. This reference to his court-appointed status was not coupled with any indication of reluctance to represent the defendant or any comment about his guilt or innocence. We find no inherent prejudice to an accused from the jury's knowledge of whether defense counsel is court-appointed or privately retained; and unless the context demonstrates a likelihood of prejudice, we will not deem counsel ineffective for mentioning that he is court-appointed when introducing himself to a panel of potential jurors.[15]

Secondly, appellant complains that counsel's closing argument asked the jury to reach conclusions which had no evidentiary support. Actually, counsel's closing argument did not so much ask the jury to reach any specific factual conclusions, as it did to urge the jury to strongly consider whether the Commonwealth had proven beyond a reasonable doubt that appellant was the perpetrator of the crimes in light of discrepancies in the crucial testimony of Stanley Trader and Sherry Diggins. Counsel suggested that Trader

**14.** The United States Supreme Court, 467 U.S. 1211, 104 S.Ct. 2651, 81 L.Ed.2d 358 (1984), vacated the judgment of the Eleventh Circuit and remanded for further consideration in light of its decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On remand, the Eleventh Circuit applied the principles announced in *Washington* and adhered to its earlier decision. *King v. Strickland,* 748 F.2d 1462 (1984). The United States Supreme Court denied certiorari at —— U.S. ——, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985).

**15.** Indeed, appointment by the court may enhance counsel's qualification in the eyes of the jury.

and Diggins may have been involved in the crimes or were covering up for someone else, possibly a relative. He pointed out that despite denying that they knew each other, Trader and Diggins had common ties through a family named Dennis. This argument was based on the evidence and was a viable challenge to the Commonwealth's burden of proof. Counsel's closing argument was not below the standard of effective representation.

Thirdly, appellant claims that trial counsel failed to prepare for sentencing and should have gathered character witnesses. We have discussed counsel's decisions with regard to the presentation of character witnesses and, suffice it to say, counsel will not be deemed ineffective for failing to prepare to present witnesses whom he has decided, on a rational basis, not to call to testify.

### IV. ALLEGATIONS OF POST–TRIAL ERRORS

Appellant contends that a number of errors occurred during the post-trial evidentiary hearing on effective assistance of counsel, which prevented him from making a complete presentation.[16] Specifically, he contends the lower court erred by: (1) denying his request for investigator funds; (2) denying his proffer of an expert witness to testify about legal and strategic decision-making in capital cases; (3) prohibiting inquiry of trial counsel about his actions at *voir dire* regarding *Witherspoon* challenges to jurors; and (4) refusing to compel production of trial counsel's fee petition.

At a hearing on the request for investigator funds, appellant's counsel stated that the basis of the request was to interview and investigate the backgrounds of twenty-three potential witnesses, the names of whom appellant gave to trial counsel, but were never contacted. The lower court expressed its concern that the application for funds lacked any mention of twenty-three potential witnesses and

16. On July 24, 1984, we granted appellant's Application to Remand for Evidentiary Hearing on Effectiveness of Trial Counsel. Such hearings were conducted in September and early October of 1984.

recommended that counsel subpoena trial counsel or have appellant testify as to which witnesses he told trial counsel to contact and why their testimony would be relevant. On the first day of the evidentiary hearing, appellant testified that he gave a list of some twenty-five potential witnesses to trial counsel and two investigators working on his behalf. Though he identified fourteen names of persons on this list, he never explained what relevant testimony they would have to offer. Post-trial defense counsel did not reassert his request for investigator funds after appellant's testimony, nor anytime thereafter, and the court never made a final ruling on the request. Since there was no clear showing as to the content, relevancy and materiality of the testimony of the potential witnesses, the trial court did not abuse its discretion in failing to grant the request for investigator funds. *Commonwealth v. Scott,* 469 Pa. 258, 365 A.2d 140 (1976).

■ In his motion for leave to call an expert witness, appellant requested that he be permitted to call a criminal trial attorney, who had prior capital case experience, to testify regarding: (1) the kind of preparation and investigation, for both the guilt and penalty phases, a reasonably competent attorney would undertake in a capital case; (2) what kind of *voir dire* a reasonably competent attorney would engage in in a capital case; and (3) what kinds of mitigating evidence a reasonably competent attorney would present in the penalty phase of a capital trial. Appellant claims the expert could have assisted the trial court in understanding what a reasonably vigorous advocate for a capital defendant would do on behalf of that defendant.

Expert testimony is permitted as an aid to the fact finder when the subject matter is distinctly related to a science, skill or occupation beyond the knowledge or experience of the average layman. *Commonwealth v. O'Searo,* 466 Pa. 224, 352 A.2d 30 (1976). The situation in the instant case is atypical in that the finder of fact, the judge, was not a layman on the subject of trial strategies and evidentiary considerations. Indeed, a trial judge, worth his salt, would

seem to require no experts to advise him on what a reasonably vigorous advocate would do in any case. The more, particularly in a case the facts and participants of which are known to him. Certainly the trial judge, himself immersed in the facts and circumstances of the very trial under scrutiny, is better able to determine from argument than an alleged expert on what a perfect trial ought to be.[17] Should it prove helpful, however, to a trial judge to hear such testimony, he may, but he is not obliged.

The trial court also prohibited post-trial counsel from questioning appellant's trial counsel as to why he did not attempt to rehabilitate certain potential jurors who were challenged for cause under *Witherspoon,* since it could only have been speculation as to how the exclusion of those veniremen affected the outcome of the trial. Although we believe it would have been better practice for the court to permit defense counsel to question trial counsel regarding his reasons for conducting the individual *voir dire* of veniremen as he did, we do not perceive any possible merit to the underlying ineffectiveness claims. Of the veniremen whose *voir dire* appellant claims he desired to investigate, but was prohibited from doing so, trial counsel attempted, unsuccessfully, to rehabilitate two. Another, venireman Read, whose *voir dire* we discussed previously, clearly expressed his inability to follow the court's instructions. The others emphatically stated that they could not impose the death sentence. Therefore, the court's prohibition of this area of inquiry was not reversible error.

Finally, appellant contends that the trial court erred in denying his motion to compel trial counsel to produce a copy of the fee petition he filed for his representation of

17. Not only is the trial judge in a better position to gauge defense counsel's representation, the relevancy of the proposed testimony is dubious since the issue in ineffective assistance of counsel claims is not what a particular, well-experienced, attorney would do, but rather whether the course of action chosen by counsel had a reasonable basis designed to further his client's interests. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Thus, there may be a number of differing trial strategies which an effective counsel could have a reasonable basis to pursue.

appellant. On the last day of the evidentiary hearing, October 3, 1984, appellant's new counsel was questioning trial counsel regarding the extent of his investigation on appellant's behalf. Trial counsel produced his fee petition and allowed appellant's counsel to review it. Trial counsel was asked why the fee petition did not reflect two phone calls supposedly made by trial counsel and mentioned in an investigative report. Trial counsel indicated that his fee petition did not necessarily reflect all of the work that he did on the case. At the end of the hearing, appellant's counsel expressed his desire to put the fee petition into evidence. Trial counsel stated that he would make a copy for him, but apparently never did. Almost two months later, the motion to compel was filed. It contended that the fee petition was necessary to discuss trial counsel's effectiveness as to preparation for trial.

Post-trial counsel had the fee petition available to him during his examination of trial counsel. In light of trial counsel's indication that the fee petition did not necessarily reflect all of the work he did on the case, we find no evidentiary value in the petition itself, unaccompanied by examination of trial counsel relative thereto. As the substance of the petition relative to the matter raised by defense counsel is a matter of record, the denial of the motion to compel was not reversible error.

## IV. CONSTITUTIONALITY OF THE PENNSYLVANIA DEATH PENALTY STATUTE

 Appellant raises numerous constitutional challenges to the Pennsylvania death penalty statute, 42 Pa.C.S. § 9711.[18] Foremost among these challenges is his conten-

---

**18.** In addition to the issues discussed in text, appellant asserts that the death penalty statute is unconstitutional (1) in requiring the defendant to prove mitigating circumstances by a preponderance of the evidence, (2) by failing to provide any fixed standard for weighing aggravating against mitigating cirucmstances and for failing to make that standard the "beyond a reasonable doubt" standard, and (3) because it violates the constitutional prohibition against cruel and unusual punishment. This Court has carefully considered these issues and fully disposed of them as meritless in *Commonwealth v. Zettle-*

tion that the statute creates a conclusive presumption favoring imposition of the death penalty by precluding the sentencing body from granting mercy or leniency to a defendant. Appellant claims that the consideration of mercy or leniency is precluded by the statute's direction that the court instruct the jury that "the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." 42 Pa.C.S. § 9711(c)(1)(iv). Although it is true that the Pennsylvania death penalty statute does not allow a jury to avoid imposition of a death sentence through the exercise of an unbridled discretion to grant mercy or leniency, the statute permits the defendant to introduce a broad range of mitigating evidence [19] that can support the finding of one or more mitigating circumstances which may outweigh the aggravating circumstances found by the jury. Appeals for mercy and leniency can be founded upon and made through introduction of evidence along this broad

*moyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1452 (1983), *reh. denied,* 463 U.S. 1236, 104 S.Ct. 1236, 77 L.Ed.2d 1452 (1983).

**19.** Evidence relevant to the following mitigating circumstances enumerated in 42 Pa.C.S. § 9711(e) is admissible at the sentencing hearing in capital cases:

(1) The defendant has no significant history of prior criminal convictions.

(2) The defendant was under the influence of extreme mental or emotional disturbance.

(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.

(4) The age of the defendant at the time of the crime.

(5) The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress), or acted under the substantial domination of another person.

(6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.

(7) The defendant's participation in the homicidal act was relatively minor.

(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

spectrum of mitigating circumstances. The channelling of considerations of mercy and leniency into the scheme of aggravating and mitigating circumstances is consistent with the mandate of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *reh. denied,* 409 U.S. 902, 93 S.Ct. 89, 34 L.Ed.2d 163 (1972), that the discretion of the sentencing body in capital cases "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), *reh. denied,* 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158 (1976).

Contrary to appellant's assertion, the United States Supreme Court decision in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), does not require that the sentencing body be given discretion to grant mercy or leniency based upon unarticulable reasons. *Lockett* holds "that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* 438 U.S. at 604, 98 S.Ct. at 2964–65. (Emphasis in original; footnotes omitted). The Pennsylvania statute clearly permits consideration of such evidence. Specifically, Section 9711(e)(8) permits the introduction of "any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. § 9711(e)(8). Thus, we find no merit to appellant's constitutional challenges to the Pennsylvania death penalty statute.

## V. PROPORTIONALITY REVIEW

■ It is the practice of this Court to conduct a proportionality review in cases in which a death sentence has been imposed. The purpose of this review is to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of

the defendant. 42 Pa.C.S. § 9711(h)(3)(iii). *Commonwealth v. Frey, supra.* In conducting this review, we are aided by a comprehensive study[20] conducted by the Administrative Office of Pennsylvania Courts of all cases resulting in a conviction for murder in the first degree from September 13, 1978 up to the present, the period of time for the relevant and effective sentencing procedures. This study includes the facts and circumstances of the crimes, the gender, race and age of the defendant and victim, the defendant's prior criminal record, if any, and other data relating to the conduct and prosecution of each case.

We have carefully reviewed this information and found that in all cases such as this one, in which the defendant has committed two or more first degree murders while in the course of a felony, was the actual killer as opposed to merely an accomplice, and has been tried, convicted and sentenced by a jury, the death penalty has been imposed, despite the defendant's lack of a significant history of prior criminal convictions. In light of this information and our own independent evaluation of the entire record in this case, we conclude that the sentence of death imposed by the jury in the instant case was neither excessive nor disproportionate to penalties imposed in similar cases. Therefore, we sustain the conviction of murder in the first degree and affirm the sentence of death.[21]

NIX, C.J., files a concurring opinion in which Zappala, J., joins.

**20.** This study is entitled "Pennsylvania Death Penalty Study," and it has been ordered by this Court in *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). This study is an ongoing one and we have imposed a continuing obligation on the President Judge of every county to supply updated data to the Administrative Office of Pennsylvania Courts on each first degree murder conviction.

**21.** Because we have upheld the sentence of death imposed by the jury, we hereby direct the prothonotary of the Eastern District to transmit to the Governor, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court as required by 42 Pa.C.S. § 9711(i).

NIX, Chief Justice, concurring.

While I concur with the result reached by the majority, I feel compelled to once again express my deep regret that the majority of this Court is content to blindly accept the death-qualification process. The prosecution-proneness of death qualified jurors has been firmly established by a number of reliable studies. *See Commonwealth v. Maxwell*, 505 Pa. 152, 170, 477 A.2d 1309, 1331, *cert. denied*, 469 U.S. 971, 105 S.Ct. 370, 83 L.Ed.2d 306 (1984) (Nix, C.J., dissenting). As I stated in *Maxwell, supra:*

> In the intervening fifteen years, the *Witherspoon* Court's understandable hesitancy has generated numerous studies of increasing reliability and precision in support of the dual hypothesis that death qualified juries are both prosecution-prone and unrepresentative. These studies now demonstrate convincingly that persons favoring the death penalty are significantly more likely to vote for conviction in capital cases and that persons excluded from jury service on the basis of their unwillingness to impose the death penalty represent a distinct and sizeable group in the community. Thus it would appear that *Witherspoon* no longer presents a valid obstacle to the challenge raised herein.

*Id.*, 505 Pa. at 171–72, 477 A.2d at 1319.

*See also Commonwealth v. Simon*, 509 Pa. 548, 506 A.2d 392 (1986) (Nix, C.J., dissenting); *Commonwealth v. Morales*, 508 Pa. 51, 73, 494 A.2d 367, 379 (1985) (Nix, C.J., dissenting); *Commonwealth v. Colson*, 507 Pa. 440, 470, 490 A.2d 811, 826 (1985) (Nix, C.J., dissenting); *Commonwealth v. Szuchon*, 506 Pa. 228, 260, 484 A.2d 1365, 1382 (1984) (Nix, C.J., dissenting).

Since this Court is apparently content to accept *Witherspoon* at face value and since the majority of the United States Supreme Court has concluded that the *Witherspoon* approach is compatible with federal constitutional standards, *see Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), I have no alternative but to defer to this approach.

I am also concerned with the majority's suggestion that an issue in a death penalty case can be waived. Recognizing the irrevocable nature of the death penalty, this Court has, in the past, firmly adhered to the rule that there can be no waiver in these cases. *See Commonwealth v. Pirela,* 510 Pa. 43, 507 A.2d 23 (1986); *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985); *Commonwealth v. Stoyko,* 504 Pa. 455, 475 A.2d 714, *cert. denied,* 469 U.S. 963, 105 S.Ct. 361, 88 L.Ed.2d 297 (1984); *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700, *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984); *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982); *rehearing denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983); *Commonwealth v. McKenna,* 476 Pa. 428, 383 A.2d 174 (1978). In this instance, however, the record reflects that the challenge to the exclusion was without merit.

ZAPPALA, J., joins in this concurring opinion.